Juliet WADE and the Eagle Foundation, Inc., Plaintiffs,

v.

Elizabeth DOLE, Secretary of the United States Department of Transportation; Ray Barnhart, Director of the Federal Highway Administration; John O. Hibbs, Regional Director for Region V, Federal Highway Administration; Jay Miller, Division Administrator, Federal Highway Administration; E.V. Heathcock, Director of Office of Planning and Program Development, Federal Highway Administration, Region V; United States Department of Transportation; and Federal Highway Administration, Defendants,

and

Harry Hanley, Secretary of the Illinois Department of Transportation, and the Illinois Department of Transportation, Defendants-Intervenors.

No. 85 C 7775.

United States District Court, N.D. Illinois, E.D.

March 24, 1986.

Edward Boraz, Landesman & Schwartz, David Ader, Ancel Gleib Diamond & Cope, Chicago, Ill., for plaintiffs.

Joan Laser, Asst. U.S. Atty., Chicago, Ill., for Federal defendants.

Russell R. Eggert, Asst. Atty. Gen., Chicago, Ill., for State defendants.

## MEMORANDUM OPINION

WILL, Senior District Judge.

This case forms a sequel to *Wade v. Lewis*, 561 F.Supp. 913 (N.D.Ill.1983), *appeal dismissed as moot sub nom. Wade v. Baise*, 767 F.2d 925 (7th Cir.1985) (unpublished order), in which this Court granted a permanent injunction barring the construction of federally-funded highway FAP 408 through Napoleon Hollow in west central Illinois. Napoleon Hollow, bordering the west bank of the Illinois River between Valley City and Florence, contains historic sites and parkland protected by section 4(f) of the Department of Transportation Act of 1966, codified as amended at 49 U.S.C. § 303(c) (formerly 49 U.S.C. § 1653(f)) ("section 4(f)"), and section 18(a) of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138 ("section 138"). These statutes each provide that the Secretary of Transportation ("Secretary") may not authorize the use of federal funds to finance the construction of highways through the land of a public park, recreation area, wildlife and waterfowl refuge, or historic site unless (1) there is no feasible and prudent alternative to using such property, and (2)

the project includes all possible planning to minimize harm to the property.

Our reasons for disallowing the proposed highway segment were two-fold: (1) the defendants planned to finance construction of two entirely new bridges over the Illinois River at Napoleon Hollow with funds appropriated by Congress for rehabilitating or replacing existing bridges, *see* 23 U.S.C. § 144; and (2) the administrative record did not adequately support the determination of the Secretary that no feasible and prudent alternatives to the Napoleon Hollow alignment existed. We retained jurisdiction to vacate or modify the injunction in the event that a proper source of funds and an adequate evaluation under sections 4(f) and 138 were secured.

In our previous opinion, we described in some detail the unique environmental, historical, archaeological, and wildlife characteristics of Napoleon Hollow. *See Wade v. Lewis*, 561 F.Supp. at 918–34. These attributes have not changed and we need not repeat them here. Napoleon Hollow remains a unique and priceless national treasure.

There have been changes, however, in the nature of the defendants' highway proposal. During the previous litigation, the defendants agreed not to construct the highway on any part of the 190-acre Wade farm. Because it is eligible for inclusion on the National Register of Historic Places, the Wade farm was then and is now protected under sections 4(f) and 138. The

plan was to carry the highway west of the Illinois River through the Pike County Conservation Area ("PCCA"), a 4(f)-protected parkland, then to curve north to avoid the adjacent Wade property. The defendants now propose to build the highway on a route (alignment # 5) that requires the taking of 31 acres of land from the PCCA and 12.5 acres from the Wade farm. Further, the defendants have adopted additional measures, described later in this opinion, to minimize harm to the PCCA and Wade farm.

A number of other significant events have occurred since our decision three years ago. First, Congress enacted Pub.L. No. 98–229, 98 Stat. 55 (March 9, 1984), section 9 of which specifically authorizes the use of bridge replacement funds to finance a new bridge in the vicinity of Napoleon Hollow. In dismissing the appeal from our previous decision, the United States Court of Appeals for the Seventh Circuit found that this act effectively mooted the dispute over funding sources. *Wade v. Baise*, 767 F.2d 925 slip op. at 5 (7th Cir.1985).[1] Second, the Secretary, acting in conjunction with the Federal Highway Administration ("FHWA") and the Illinois Department of Transportation ("IDOT"), conducted additional studies and developed a new 4(f) Statement concluding that there are no feasible and prudent alternatives to running the highway through Napoleon Hollow along alignment # 5.

---

**1.** Congress spoke quite clearly on the funding question. Section 9 of Pub.L. No. 98–229, 98 Stat. 55, entitled "Interstate Highway Construction: Apportionment of Funds" provides:

Construction of any bridge—

(1) which will be part of a four-lane expressway on the Federal-aid primary system in the vicinity of Valley City, Illinois, and Florence, Illinois;

(2) construction of which received discretionary funding in fiscal year 1979 under the third sentence of section 144(g) of Title 23, United States Code; and

(3) construction of which, on May 1, 1983, was prohibited by judicial injunction; shall be eligible for assistance under section 144 of such title.

As the court of appeals held, this legislation confirmed that the defendants could properly

finance construction of the proposed bridges with funds appropriated for the Bridge Replacement and Rehabilitation Program under 23 U.S.C § 144. *Wade v. Baise*, slip op. at 4. The court declined to decide whether the defendants could use monies appropriated before the enactment of the legislation. We need not decide this question either, because the record is now clear that the monies were appropriated in July, 1985 and October, 1985. Fed. Correspondence Vol. 3 at 62, 65, 66, 69.

Undaunted, the plaintiff continues to press the funding issue, arguing that the bridge may not be funded on the basis of an eligibility determination made prior to the *Wade v. Lewis* decision. This argument has no basis in law or fact. Congress determined that the bridge was eligible; no more need be said.

Thus, the question of the validity of the Secretary's prior 4(f) Statement also was rendered moot. *Id.* at 6.

By direction of the court of appeals, we dismissed the previous case as moot. Subsequently, the plaintiff in the previous case, Juliet Wade, and her lessee the Eagle Foundation, Inc., filed the present action against the Secretary, the Department of Transportation, the FHWA, and various officials of these agencies ("federal defendants"). The Secretary of the Illinois Department of Transportation ("IDOT") and IDOT itself were granted leave to intervene as defendants ("state defendants"). Juliet Wade died in the fall of 1985, and her successors did not seek leave to intervene in this case, but the Eagle Foundation continues to seek a new permanent injunction against construction of FAP 408 through Napoleon Hollow.

Based on an extensive administrative record and numerous additional documents submitted for purposes of judicial review, the parties filed cross-motions for summary judgment. For the reasons stated below, we affirm the Secretary's findings (1) that there are no feasible and prudent alternatives to building FAP 408 through Napoleon Hollow at alignment #5, and (2) that the project includes all possible planning to minimize harm to the Wade farm and the PCCA. We therefore grant the Secretary's motion for summary judgment and deny the plaintiff's motion for summary judgment.

### I. Capacity to Sue and Standing

The defendants' maintain that the Eagle Foundation is not entitled to challenge the validity of the Secretary's 4(f) determination. Their first line of argument is that the Eagle foundation has no legal capacity to sue because it is neither incorporated in Illinois nor registered to do business here as a foreign not-for-profit corporation. After the filing of the state and federal defendants' joint memoranda, the Eagle Foundation produced documents establishing (1) that it is incorporated under the laws of Wisconsin as a nonstock, not-for-profit corporation, *see* Plaintiff's Exhs. 10,

26; and (2) that it has secured from the Secretary of State of Illinois a certificate of authority to conduct business in Illinois as a foreign not-for-profit corporation. *See* Plaintiff's Exh. 27; Ill.Rev.Stats. ch. 32, ¶ 163a66. As we explain below, these documents settle the question of the plaintiff's legal capacity to sue in this Court.

Rule 17(b) of the Federal Rules of Civil Procedure provides that "The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." Because the plaintiff is pursuing a purely federal cause of action, any limitations that Illinois law might place on the right of a foreign corporation to maintain a lawsuit in Illinois are inapplicable to this case. 3A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 17.21 (2d ed. 1985). Under Rule 17(b), we look solely to Wisconsin law, which provides unequivocally for the right of a corporation in the shoes of the Eagle Foundation to sue. *See* Wis.Stat. § 181.04(2) ("Each [nonstock, not-for-profit] corporation ... shall have power ... [t]o sue and be sued, complain and defend, in its corporate name."). Accordingly, the plaintiff has legal capacity.

The question remains whether the plaintiff has standing. Standing "involves both constitutional limitations of federal court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The constitutional test focuses on whether the plaintiff has suffered "some actual or threatened injury" that "fairly can be traced to the challenged action" of the defendant. *Valley Forge Christian College v. Americans United,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The prudential test asks "whether the interest sought to be protected by the complainant is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). This latter test is "a generous standard which nonetheless

serves as a limitation, albeit loosely defined, on those who can use the federal courts to resolve complaints arising from agency action taken pursuant to a particular statutory mandate where there exists no specific congressional authorization of review." *Peoples Gas, Light & Coke Co. v. United States Postal Service*, 658 F.2d 1182, 1195 (7th Cir.1981).

The defendants concede, as they must, that the Eagle Foundation has standing to challenge the proposed use of the PCCA. *See Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Benton Franklin Riverfront Trailway and Bridge Committee v. Lewis*, 701 F.2d 784, 787 (9th Cir.1983). As to the Wade property, however, they contend that the plaintiff lacks standing because it has not alleged and cannot prove "some actual or threatened injury" to its interests. We disagree.

■ In their memoranda, the parties dispute the precise nature of the plaintiff's interest in the Wade property. Apparently, the ambiguity awaits resolution by a will contest in state court. It is uncontested, however, that the plaintiff is the lessee of a ten-acre plot in the northwest corner of the Wade property which it manages as a wildlife sanctuary. The lease agreement, signed by Juliet Wade as land owner and Terrence Ingram as Executive Director and President of the Board of the Eagle Foundation, grants the Eagle Foundation the right "to conduct any necessary research to determine what plants and animals, especially endangered species, are present and how they are using the area." Plaintiff's Exh. 12. This activity is consistent with the plaintiff's corporate purposes which, as stated in its articles of incorporation, include "the preservation and restoration of our natural environment including the flora, fauna and physical conditions that are part of it." Plaintiff's Exh. 10.

Though the proposed highway would cross the Wade property to the south of the wildlife sanctuary, it plainly endangers the plaintiff's interest. The defendants in effect concede as much in their proposals to minimize harm to the Wade property in general and the wildlife sanctuary in particular. *See 4(f) Statement*, Vol. 1 at 165, 167. Given the plaintiff's corporate purposes and its rights under the lease, a threat to the well-being of the plants and wildlife in the sanctuary is a threat to the Eagle Foundation's interest. The Supreme Court has recognized that injuries to " 'aesthetic, conservational, and recreational' as well as economic values" are actionable. *Association of Data Processing Service Organizations v. Camp*, 397 U.S. at 154, 90 S.Ct. at 830. The Eagle Foundation's interests arguably fall within all four of these categories.

■ The defendants next contend that the plaintiff's rights as lessee of the Wade property are not within the "zone of interest" to be protected by sections 4(f) and 138. According to the defendants, the plaintiff's only interest in the Wade property is in the wildlife sanctuary. Further, the defendants note, the Eagle Foundation's corporate purposes do not extend to historic preservation. Since the Wade property receives 4(f) protection not for its environmental attributes but for its status as an historic site, the defendants conclude that the plaintiff lacks standing to raise claims related to the property's 4(f) status.

The defendants' argument is original but unpersuasive. In order to apply the zone of interest test, the applicable statutes must first be examined. Each of the statutes at issue in this case declare, in identical terms, that "special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(c); 23 U.S.C. § 138. The national policy of encouraging wildlife conservation and historic preservation is thus expressed in a single sentence. We would do violence to the statutes' clear language if we were to fragment their terms into independent interests for purposes of determining standing. Plainly, the Eagle Foundation as lessee of the Wade farm is within the zone of interest carved out by the statutes.

■ Finally, under the circumstances of this case, the plaintiff has standing as to the Wade farm simply by virtue of its conceded standing to challenge the highway's encroachment on the PCCA. As we discuss later in this opinion, for purposes of developing their new 4(f) Statement the defendants treated the adjacent properties of the Wade farm and the PCCA as a single 4(f) resource. Since the two properties were treated as one for purposes of measuring the total harm to 4(f) properties, the Secretary's findings respecting the Wade farm necessarily implicate the PCCA. The two properties should be treated as one for purposes of determining standing as well.

## II. Legal Standards

### A. The Administrative Record

■ In reviewing the Secretary's decision, we consider "the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). Of course, in reaching the decision the Secretary herself may have had little or nothing more before her than the recommendation of a subordinate. But the term "Secretary" in this context refers not merely to an individual but to an entire process of bureaucratic decisionmaking. In the present case, the individual Secretary designated Ennis V. Heathcock, Director of the Office of Planning and Program Development for the FHA, Region 5, as the final decisionmaker. *Cf. Ashwood Manor Civic Assoc. v. Dole*, 619 F.Supp. 52, 65–72 (D.C. Pa.) (approving delegation of Secretary's decisionmaking authority to regional director of FHWA and discussing nature of decisionmaking process in 4(f) cases), *aff'd mem.*, 779 F.2d 41 (3d Cir.1985). Heathcock relied on materials provided by federal administrators, environmental experts, engineers, biologists, government counsel and others. These individuals in turn delegated much of the task of developing the 4(f) Statement and its accompanying exhibits to

state officials (as they are specifically authorized to do by 23 C.F.R. § 771.109(c)).

Due to the complex nature of the decision making process in this case, the record "before the Secretary" must include "all documents and materials directly or indirectly considered by agency decision-makers." *Exxon Corp. v. Dept. of Energy*, 91 F.R.D. 26, 33 (N.D.Tex.1981). To this end, we permitted the plaintiff to supplement the record submitted by the federal defendants with relevant documents from the files of IDOT and other state agencies that played a significant role in the decisionmaking process. *Cf. Arizona Past & Future Foundation v. Lewis*, 722 F.2d 1423, 1426 n. 5 (9th Cir.1983). The defendants were permitted to withhold only those portions of documents that fell within the narrow scope of the attorney-client and work-product privileges. (No other privileges were asserted). *See Coastal Corp. v. Duncan*, 86 F.R.D. 514 (D.Dela.1980). Though the vastness of the resulting record complicates our task somewhat, a full history of the decisionmaking process is essential to meaningful judicial review.

### B. Standard of Review

The standard of review is provided by section 706 of the Administrative Procedure Act, which requires a reviewing court to set aside agency determinations that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Though the Secretary's decision is entitled to a presumption of regularity, "that presumption is not to shield his action from a thorough, probing, in-depth review." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. Nevertheless, the ultimate standard of review is narrow. This Court is "not permitted to substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. at 824.

■ In reviewing the Secretary's decision, we must consider whether: (1) the Secretary acted within the scope of her authority; (2) the Secretary properly construed her authority to approve the use of parkland as limited to situations where there are no feasible and prudent alterna-

tive routes; (3) the Secretary could have reasonably believed in this case that there are no feasible and prudent alternatives; (4) the Secretary's decision was based on a consideration of the relevant facts; (5) the Secretary made a clear error of judgment; and (6) the Secretary's action followed the necessary procedural requirements. *Id.* at 415–17, 91 S.Ct. at 823–24; *see also Stop H–3 Assoc. v. Dole,* 740 F.2d 1442, 1449 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985).

## C. Sections 4(f) and 138

Sections 4(f) and 138 set the substantive boundaries of the Secretary's discretion. Only "the most unusual situations are exempted" from the general statutory prohibition. *Overton Park,* 401 U.S. at 411, 91 S.Ct. at 821.

■■■ As mentioned earlier, the Secretary may approve federal funding of a highway project that uses parklands or historic sites only when two preconditions are met. First, there must be no feasible and prudent alternative to the use of protected properties. 49 U.S.C. § 303(c)(1); 23 U.S.C. § 138(1). Whether an alternative is "feasible" depends upon whether it can be accomplished "as a matter of sound engineering." *Overton Park,* 401 U.S. at 411, 91 S.Ct. at 821. "Prudence" connotes a broader inquiry. Though the court is not to engage in a "wide-ranging balancing of competing interests," neither are such factors as cost, directness of route, and community disruption to be ignored. *Id.* at 412, 91 S.Ct. at 821. But they must reach "extraordinary magnitudes" before they can surpass the "paramount importance" of preserving parklands and historic sites.

*Id.* at 413, 91 S.Ct. at 822. "The primary focus of inquiry needs to be upon the harshness of the problems inherent in the alternative, not upon the comparative freedom from those problems by use of the parklands." *Citizens to Preserve Wilderness Park v. Adams,* 543 F.Supp. 21, 27 (D.Neb.1981), *aff'd mem.,* 685 F.2d 438 (8th Cir.1982). Second, the project must include all possible planning to minimize harm to the protected properties. 49 U.S.C. § 303(c)(2); 23 U.S.C. § 138(2).

## III. The New 4(f) Statement

Our previous ruling left the defendants essentially two choices: to abandon the Napoleon Hollow alignment or to undertake new studies reexamining the availability of feasible and prudent alternative routes. In May, 1983, one month after our decision, IDOT appointed a study team to investigate all possible routes, including Napoleon Hollow. Though the plaintiffs contend that the study team was predisposed from the start to recommend a Napoleon Hollow alignment, internal IDOT memoranda make clear that the study team members understood their task to be to give fresh consideration to the question. *See, e.g.,* Plaintiff's Exhs. 1, 2; Fed. Correspondence Vol. 1, Exh. 3.[2] More importantly, the study results speak for themselves, both in quantity and quality.

Initially, the field of alternatives included those mentioned in our previous opinion. *See Wade v. Lewis,* 561 F.Supp. at 926. The reexamination process ultimately resulted in the consideration of seven main alternatives, fourteen sub-alternatives, and a "no-build" alternative. *See 4(f) Statement,* Vol. 2, Fig. 2 (attached to this opin-

---

**2.** After an October, 1983 meeting in which IDOT officials briefed FHWA representatives on the progress of the new studies, Robert Bolger, Regional Counsel of the FHWA, reported that the study team "had been given free rein to try and develop an alternative to going through Napoleon Hollow. They were told they need not be tied to anything that had gone before, but they were to apply fresh thinking to the whole matter and determine whether a reasonable alternative could be found to going through Napoleon Hollow." Attorney-Client Document A.

The plaintiff's briefs are replete with accusations of prejudice against the Wade farm and conspiracy to evade the strictures of sections 4(f) and 138. If there is any support for these theories, it cannot be found in the record before us and it certainly cannot be found in the documents cited by the plaintiff. While one might speculate that the defendants were clever enough to avoid commiting their prejudices to paper, mere speculation provides no basis for overturning the Secretary's decision.

ion as an exhibit). The study team commissioned new biological studies "in order to evaluate specific impacts of other alignments and the Napoleon Hollow alternate." Plaintiff's Exh. 2. In particular, the study team sought and obtained additional data on the possible effects of the various alignments on endangered species found within the study area—the American bald eagle and the Indiana bat. *See* Tech. Report P. Throughout, the study team focused on developing quantitative and comparative data of the sort we found lacking in our previous opinion.

The record before us now includes (1) the 4(f) Statement in two volumes including exhibits and comparison tables; (2) two volumes of federal correspondence; (3) two technical appendices including over 100 cross-sections and profiles of the various alternatives studied; (4) sixteen technical reports covering aesthetic, drainage, wildlife, archaeological, historical, engineering, and cost considerations; (5) a final eagle report; and (6) a "Public Involvement Volume" ("P.I.V.") containing the record of a public hearing held August 30, 1984 in Griggsville, Illinois. This latter volume comprises over 250 pages of newspaper articles concerning the public hearing, letters received from citizens, and oral and written comments, both supporting and critical, on the new 4(f) Statement, and the defendants' responses to these comments. *See* 23 U.S.C. § 128.

In the section that follows, we discuss the methodology of the new 4(f) evaluation, giving particular attention to the considerations of "prudence" condemned by the plaintiff as impermissible.

### A. Methodology and Prudential Considerations

#### 1. *"Control Points"*

The plaintiff maintains that the defendants' choice of boundaries—or "control points"—for the new 4(f) study so skewed the results in favor of a Napoleon Hollow alignment as to render the Secretary's decision arbitrary and capricious. To assess this argument, it is necessary to review the reasons given by the defendants for their decision.

The original environmental impact statement considered in *Wade v. Lewis* involved a 52-mile corridor extending from Jacksonville, Illinois on the east to Barry, Illinois on the west. Because the only defects identified in *Wade v. Lewis* concerned the 4(f) properties and the proposed bridge in the vicinity of Napoleon Hollow, the defendants determined that it was not necessary to reevaluate the entire 52-mile stretch. Accordingly, they restricted their study to a specified segment of the proposed highway within which alternative routes would be considered.

In setting the boundaries of the study segment, the defendants began by identifying seven possible bridge locations across the Illinois River. *See* Fed. Correspondence Vol. 1, Exh. 3. The east-west termini were set at the first major routes located east and west of the Illinois River, i.e., Route 100 in Scott County to the east and Route 107 in Pike County to the west. *4(f) Statement*, Vol. 1 at 10. These locations provided interchanges with major north-south routes and assured good access to the surrounding communities. P.I.V. at 103–05, 163. Along the north-south axis, the defendants maintained the boundaries established in the 1966 *Central Illinois Expressway (CIE) Location Report*. The northern boundary was set just below the Norfolk & Western Railroad tracks near Valley City in order to avoid the need for multiple railroad crossing bridges and numerous adverse environmental impacts. *See 4(f) Statement*, Vol. 1 at 10. To the south, the defendants set the boundary at U.S. 36 at Florence. Any alignment located beyond U.S. 36, they believed, would divert traffic too far south to fulfill the purposes of the project, which are: "(1) to provide equitable highway service to the smaller communities of west central Illinois; and (2) to better serve long distance traffic needs between the Quincy-Hannibal area and Springfield." *Id.* at 2.

The Secretary is not required to give plenary consideration to every conceiv-

able alternative before she may conclude that there are no feasible and prudent alternatives to the use of 4(f) property. *Monroe County Conservation Council v. Adams,* 566 F.2d 419, 425 (2d Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *Brooks v. Coleman,* 518 F.2d 17, 19 (9th Cir.1975). But she must be able to demonstrate a reasoned methodology for narrowing the range of alternatives. The record demonstrates that the defendants' choice of a study area was made in a reasoned fashion, consistent with the purposes of the project and the need for identifying feasible and prudent alternatives. Though it is true that Napoleon Hollow lies conveniently in the middle of the study area, so that the shortest line between the east-west control points cuts directly through the 4(f) properties, the study area is sufficiently large to permit a broad range of alternatives that do not traverse 4(f) property.

This is not a case such as *Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept.,* 446 F.2d 1013 (5th Cir.1971), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972), in which the Secretary approved the construction of a highway to the borders of both sides of a park, severely limiting the number of feasible and prudent alternatives. In the present case, the study area is eleven miles long and five miles deep, with none of the control points in close proximity to a 4(f) property. In sum, the boundaries selected did not preclude a wide range of alternatives from being considered, nor did they bias the selection process in favor of Napoleon Hollow.

### 2. *Cumulative Impacts*

The alternative routes considered by the defendants were rejected, in many instances, on the basis of their cumulative adverse impacts. As described in the "Framework of Analysis" section of the 4(f) Statement, "Adverse impacts associated with alternative alignments are considered cumulatively in assessing prudence. Such impacts on a spectrum of environmental and other concerns, considered cumulatively, can render

an alternative alignment imprudent." *4(f) Statement,* Vol. 1, at 109–10.

Though the plaintiff does not directly challenge the practice of cumulating impacts, it appears to consider this approach improper. Throughout its briefs, the plaintiff objects to the elimination of alternatives on the basis that no single factor, considered separately, would establish that the alternative is not feasible or prudent. Because this misconception infects virtually every page of the plaintiff's briefs, we discuss it separately here.

We are aware of only one case which expressly considers the propriety of cumulative impact analysis, and it approves the practice. *Citizens to Preserve Wilderness Park v. Adams,* 543 F.Supp. at 35; *see also Stop H–3 Assoc. v. Dole,* 740 F.2d at 1451 n. 14 (declining to reach question). But in numerous cases the practice has been implicitly sanctioned by courts that themselves have employed it. *See, e.g., Louisiana Environmental Society v. Dole,* 707 F.2d 116 (5th Cir.1983); *Adler v. Lewis,* 675 F.2d 1085 (9th Cir.1982); *Monroe County Conservation Council v. Adams,* 566 F.2d 419; *Brooks v. Coleman,* 518 F.2d 17; *National Wildlife Federation v. Lewis,* 519 F.Supp. 523 (D.Conn.1981), *aff'd,* 677 F.2d 259 (2d Cir.1982); *Ashwood Manor Civic Assoc. v. Dole,* 619 F.Supp. 52; *Conservation Society of Southern Vermont v. Secretary of Transportation,* 443 F.Supp. 1320 (D.Vt.1978).

The cumulative impact approach is consistent with the plain meaning of "prudent," the policies expressed in *Overton Park,* and the regulations implementing the National Environmental Policy Act. *See* 40 C.F.R. § 1508.7 ("Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."). Further, it recognizes the reality that in nature such factors as safety, wildlife mortality, flooding, and farm severance do not occur in isolation. We conclude, therefore, that adverse impacts which considered separately would not be "truly unusual factors," *Overton Park,* 401 U.S. at 413, 91 S.Ct. at

822, may support a finding of "not prudent" when considered collectively.

Of course, it will not be easy to make a showing of cumulative impact that rises to the level of a "unique problem" of "extraordinary magnitudes." *Id.* To do so, the Secretary must rely solely on legitimate adverse impacts that are fully documented in the record. We therefore postpone consideration of whether the cumulative impact analysis was properly applied in this case until our discussion of the various alternative routes rejected by the Secretary.

### 3. *Costs*

■ The plaintiff maintains that the defendants' cost analysis is impermissibly biased in favor of alignment # 5 (Napoleon Hollow) because it excludes costs incurred prior to the *Wade v. Lewis* decision. It is undisputed that, at the time of our injunction, $14.2 million had been spent on FAP 408 from U.S. 36 north of Winchester to east of Route 107 on the west side of the Illinois River. *4(f) Statement,* Vol. 1 at 9. Of this amount, $10.5 million was spent on the segment from U.S. 36 north of Winchester to Route 100 east of the Illinois River, a segment which traversed no 4(f) properties and was not affected by our injunction. *Id.* Nearly $2.7 million was invested in the Napoleon Hollow alignment. *Id.*[3] It is this sum that the plaintiff contends should have been included in measuring the costs of alignment # 5.

The defendants concede that they did not include previously incurred costs—or "sunk costs"—in measuring the total cost of alignment # 5. But they contend that the only appropriate yardstick is *the cost of completing the highway.* Moreover, they assert that their method for estimating costs is consistent with generally accepted principles of cost accounting and engineering economics. *See* Grant and Ireson, "Increment Costs and Sunk Costs," in *Principles of Engineering Economy* 301 (1976)

("[t]he only possible difference between alternatives for the future are differences in the future.").

We have serious reservations about the validity of the defendants' cost analysis. Because it excludes sunk costs, and the Napoleon Hollow alternative is the only alternative on which any costs were "sunk," the defendants' analysis gives Napoleon Hollow a cost advantage relative to the other alternatives. In effect, Napoleon Hollow becomes the only alternative for which no "start-up" costs would have to be paid. As one federal official noted, this approach does not provide an "apples-to-apples" comparison of Napoleon Hollow with the alternative routes. *See* Minute-Memo from Lionel Wood, Director, Regional Office of Engineering and Operations, to Ennis Heathcock, Director, Planning and Program Development, Dec. 31, 1984, at 3; Attorney-Client Doct. F.

On the other hand, the defendants' approach merely recognizes, as a reasonable administrator might, the reality that some of the preliminary work for a Napoleon Hollow alignment has already been performed and paid for. In addition, $870,000 of the sum in question was for archaeological testing and salvage, *see supra* note 3, an expense that has not been computed into the estimated cost of the alternatives, although they too would be likely to involve such expenses. *See* P.I.V. at 158–59.

But we need not enter further into this morass. The sum in question, $2.7 million, is not so significant that it could conceivably have affected the Secretary's ultimate determination. Alignment # 5 is estimated to cost $79,880,000, or over $8 million less than the next least expensive alternative. *See 4(f) Statement,* Vol. 1, Tables 4, 5A, 5B. Even when $2.7 million is added in, alignment # 5 remains, by a comfortable margin, the least expensive alternative.

More importantly, as discussed in the preceding section, the determination that

---

**3.** The 4(f) Statement lists the following sums spent on Napoleon Hollow prior to our injunction: $700,000 for preparation of river bridge plans; $870,000 for archaeological testing and salvage; $1,100,000 for right-of-way on the east side of the river; and $12,000 for a biological assessment. *4(f) Statement,* Vol. 1 at 9.

no feasible and prudent alternatives existed was made on the basis of the cumulative impact of a number of factors. Cost was only one consideration. This is as it should be, for "cost is a subsidiary factor in all but the most exceptional cases." *Coalition for Responsible Regional Development v. Brinegar*, 518 F.2d 522, 526 (4th Cir.1975). Viewing the record as a whole, it is quite clear that cost did not play so significant a role in the Secretary's 4(f) determination that an additional $2.7 million in the estimated cost of alignment #5 would have caused other alternatives to appear, by comparison, "prudent."

For similar reasons, we need not decide whether, as the plaintiff contends, the defendants should have compared the cost of each alternative to the total cost of constructing the highway from Jacksonville to Barry. While such data might be required in a case where cost is clearly the controlling factor in the Secretary's decision, it is not required in this case.[4]

### 4. *Aesthetics*

As one factor in their analysis of prudence, the defendants considered whether the various alternatives found to be feasible were aesthetically compatible with the surrounding landscape. The plaintiff contends that aesthetic considerations should play no part in assessing prudence.

The defendants rely in part on language contained in the preamble to sections 4(f) and 138. There it is declared that "special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a); 23 U.S.C. § 138. The inclusion of "countryside" in this listing is perhaps significant. Unlike the other lands

mentioned, "countryside" is not a type of 4(f) property that is protected by the "feasible and prudent" and "minimization of harms" standards of the statutes. This suggests that the congressional policy of preserving the natural beauty of the nation's lands extends beyond 4(f) properties to the general "countryside."

Undoubtedly, it would stand the statutes on their heads to hold that adverse visual impacts on non-4(f) properties may, in and of themselves, justify the use of 4(f) properties for highway construction purposes. But the plaintiff paints with too broad a brush in arguing that the Secretary may give no weight at all to aesthetic considerations. We think it is appropriate for the Secretary to give some weight, though never controlling weight, to aesthetic considerations. *See, e.g., Louisiana Environmental Society v. Dole*, 707 F.2d 116 (5th Cir.1983). Our review of the record satisfies us that aesthetic considerations were only one factor influencing the Secretary's determination that no feasible and prudent alternatives were available. Therefore, aesthetic considerations did not play an improper role in the Secretary's decision.

### 5. *Agricultural Impacts*

The plaintiff's next contention is that the defendants gave too much weight to the policies expressed in the Farmland Protection Policy Act of 1981, 7 U.S.C. §§ 4201–4209 ("FPPA"). The purposes of the FPPA include "minimiz[ing] the extent to which Federal programs contribute to the unnecessary and irreversible conversion of farmland to nonagricultural uses." 7 U.S.C. § 4201(b). As an additional purpose, the FPPA aims "to assure that Federal programs are administered in a manner

---

**4.** For similar reasons, the plaintiff objects to the 4(f) Statement's reliance on the time-to-completion advantages of alignment #5 as compared to other routes. The feasible alternative routes are estimated to take one and one-half to three and one-half years longer to complete than alignment #5. *See 4(f) Statement*, Vol. 1, Table 10; *Id.* at 124–26. Although the time already invested in the Napoleon Hollow alignment may be one factor contributing to the time disparities, it

is clear that the length of the various segments, the amount of rock-cutting involved, and the necessity for additional environmental or archaeological studies accounted for the bulk of the difference. Moreover, the final federal decisionmaker did not even mention the time-to-completion data in making his prudence assessment. *See* Final Section 4(f) Evaluation (Heathcock), Fed.Corr., Vol. 1 at 314–21.

that, to the extent practicable, will be compatible with State ... policies to protect farmland." 7 U.S.C. § 4201(b). The FPPA directs the Department of Agriculture to "develop criteria for identifying the effects of Federal programs on the conversion of farmland to nonagricultural uses." 7 U.S.C. § 4202(a); *see* 7 C.F.R. §§ 658.1–658.7.

The defendants' concern for possible agricultural impacts permeates the record. In particular, the defendants sought to minimize the use of high quality farmland and to reduce the amount of farm land severance.[5] The record contains extensive comparative data on the number of farm units affected, the size of management zones created, and the adverse farmer travel and lost agricultural production caused by the various alternative routes. *4(f) Statement*, Vol. 1, Tables 1, 2. Significantly, the Illinois Department of Agriculture indicated that it would strongly oppose the choice of any of the alternatives to alignment # 5. *Id.*, Exh. 9.

The defendants do not deny that in developing the new 4(f) Statement they considered agricultural impacts to be of "major importance." *Id.* at 17. They contend, however, that the emphasis on agricultural impacts did not cause them to lose sight of the primacy of the federal policy respecting parklands and historic sites.

■ We agree. As we have already stated, the record is quite clear that the defendants understood their task to be to avoid the use of 4(f) property unless no feasible and prudent alternatives existed. In determining what is "prudent," they were entitled to give substantial weight to the importance of protecting farmlands where possible.

The issue of the FPPA's applicability is something of a red herring. What matters is that the goal of protecting farmlands—whether it derives from the FPPA, from state laws and policies that the FPPA is designed to protect, *see, e.g.,* Illinois Farm Preservation Act, Ill.Rev.Stat. ch. 5, ¶¶ 1301–1308; Illinois Department of Transportation Agriculture Land Preservation Policy, *4(f) Statement*, Vol. 1., Exh. 2, or from some other source—is a legitimate consideration in assessing the prudence of the various alternative routes. Among other reasons, agriculture accounts for about 90% of land use in Pike and Scott counties, the counties affected by the challenged segment of FAP 408. *4(f) Statement*, Vol. 1 at 15–16. As recognized in *Overton Park*, "community disruption" is a key factor in assessing the prudence of alternative routes. 401 U.S. at 413, 91 S.Ct. at 822.

Agricultural impacts do not justify overlooking the "paramount importance," *id.*, of preserving the nation's parklands and historic sites. But the defendants did not do so here. Under the circumstances of this case, farm impact was a legitimate, indeed a necessary, factor in assessing prudence.

---

5. "Severance impacts on agricultural lands and operations are a function of three conditions: (a) the number of uneconomical remnants created (an uneconomical remnant is the remainder of acreage so small as to limit or even preclude its use for productive agricultural purposes); (b) the amount of adverse travel caused by the highway (when a farmer owning land on both sides of a highway must take a circuitous route to get from one location of his farm to the other) and (c) the size of severance management zones created." *4(f) Statement*, Vol. 1 at 17.

This latter condition, the creation of severance management zones, is given particular weight in the 4(f) Statement. Severance management zones are created when a highway cuts diagonally across a tract of farm property.

As a result, "Point rows are created when the long field rows intersect the end rows which are parallel to the highway. Farm machinery use during cultivation, planting, fertilizer and herbicide application, and during harvest will cause production losses due to the skewed rows forcing the farmer to turn his tractor and implements in a manner which damages or removes plants and overapplies farm chemicals by overlapping. Additional operating costs are incurred with increased consumption of oil and fuel, additional wear on tires, brakes, hydraulic systems, and equipment. If an average of 5 to 10 field trips are necessary in a given year, to plant, raise, and harvest a crop, it is easy to see that the cost of field operations will be substantially increased." *Id.* at 18.

## B. Alternative Routes

The defendants considered seven basic routes across the Illinois River in the study area. Alignment # 1, the northernmost route, crosses the river in the Flint Creek valley south of Valley City. The next route south is alignment # 2, located 1350 feet south of the centerline of the Norfolk & Western Railroad bridge. Alignment # 3 is 2600 feet south of the railroad bridge, and alignment # 4 is 3300 feet south. Alignment # 5 is the Napoleon Hollow alignment, located about 6000 feet south of the railroad bridge. Alignment # 6 crosses the Illinois River at Blue Creek and alignment # 7 is located at Florence.

### 1. *Summary Dismissals*

Several alternatives were found to be not feasible and therefore unworthy of further study. Alignments 1, 1A, and 1B all involved design features that were unacceptable for engineering and safety reasons. Though various modifications were attempted, none met the basic requirements for engineering feasibility. *See 4(f) Statement*, Vol. 1, at 52–56, 69–70; App. A, Figs. 45–58. Alternative D, located on a narrow ridge between two deep ravines, presented serious drainage problems leading to potential safety hazards. Moreover, alternative D (one of the routes considered in the original EIS/4(f) Statement), was not a true avoidance alternative because it required the taking of lands from both the Wade farm and the PCCA. After discovering that these alternatives were not feasible, the defendants were entitled to eliminate them from the study.

Several other alternatives were eliminated early in the evaluation process. A "no-build" or "do-nothing" alternative was rejected because it leaves an eleven mile gap in the highway and therefore does not meet the need for the project. In reaching this conclusion, the defendants noted our observation in *Wade v. Lewis* that the need for a major east-west thoroughfare in west central Illinois was "apparent from the record." 561 F.Supp. at 954. The need today is certainly no less.

Alignment # 4 was eliminated because the western bluff to be intersected by the highway contains an historic site, the Naples-Russell Mound # 8, eligible for listing on the National Register. *See id.* at 923; Tech. Report K at 9. This Indian burial mound has religious and historical importance to the Mormon people and qualifies as a 4(f) property. Thus, alignment # 4 was not a true avoidance alternative. *See Louisiana Environmental Society v. Coleman*, 537 F.2d 79, 85 (5th Cir.1976).

Alignment # 6 also was found to present 4(f) problems. This alternative, designed to take advantage of a break in the bluffs at the Blue Creek Valley south of the PCCA, passes over three acres of Big Blue Island. Big Blue Island was purchased by the state of Illinois at the same time as the PCCA and is considered an adjunct to it. In addition, it has been identified as the most important bald eagle foraging location in the region. Final Eagle Report at 6. According to Dr. Thomas C. Dunstan of Western Illinois University, Big Blue Island is attractive to eagles because of its number of foraging perches, its isolation from human activity, its location at a point along the river which continues to flow freely throughout much of the winter, and its proximity to the documented night roost in the southern portion of the PCCA. *4(f) Statement*, Vol. 1 at 131. Alignment # 6 also passes through an area south of the PCCA that Dr. Dunstan proposed that the state purchase for additional eagle habitat. (The purchase is now part of the defendants' proposed mitigation plan, discussed below). Finally, alignment # 6 causes severe farm severance problems and is believed to disrupt significant archaeological resources from the Middle Woodland period. *See* Tech. Report L. From this record, the defendants could reasonably conclude that alignment # 6 is not a true avoidance alternative and that its selection would not be prudent.

### 2. *Alternatives Rejected on the Basis of Cumulative Impacts*

Five alternatives were rejected on the basis of their cumulative adverse impacts.

In this section, we discuss the reasons given for their elimination as imprudent.

*Alignment #7.* Alignment #7 is the southernmost route, crossing the Illinois River near Florence. Unlike the other alternatives, which cross route 107 at a point approximately half way between Pittsfield and Griggsville, alignment #7 crosses route 107 just north of Pittsfield and then follows U.S. 36 on an essentially parallel course to Barry. East of the Illinois River, alignment #7 runs parallel to route 100. *See 4(f) Statement,* App. A, Figs. 95–99.[6]

Due to sharp horizontal and vertical curves in routes 100 and U.S. 36, very little of the existing pavement or alignments could be used for a major expressway, although some of the right-of-way could be used. Fed.Corr., Vol. 1, Exh. 3. A new bridge would be required at Florence because the existing lift bridge (though renovated since our decision in *Wade v. Lewis* at an expense of $6.2 million) is not compatible with a major four-lane expressway.

Compared to alignment #5, alignment #7 would add 4.2 miles to the length of the highway, cause greater farm severance, require 102 additional acres of land, cost $35 million more, and take longer to complete. In addition, east of the Illinois River, the highway would traverse 3.4 miles of the Illinois River flood plain longitudinally. As the defendants note, FHWA policy holds that longitudinal flood plain encroachments are to be avoided where practicable due to potential adverse impacts on natural drainage patterns. *See* Federal-Aid Highway Program Manual 6–7–3–2, Transmittal 315, 15 November 1979; 23 C.F.R. § 650.113 ("A proposed action which includes a significant [flood plain] encroachment shall not be approved unless the FHWA finds that the proposed significant encroachment is the only practicable alternative.").

Finally, alignment #7 was deemed not to meet the objectives of the project. As stated earlier, these objectives are to improve long distance service between the Quincy-Hannibal area and Springfield and to provide equitable highway service to the small communities in west central Illinois. Although we might question whether an additional 4.2 miles in a 100-mile segment of highway could be considered a significant impact, we must show considerable deference to the Secretary's determination as to which communities must be served by the project. "Alternatives that do not accomplish the purposes of the project may properly be rejected as imprudent." *Arizona Past & Future Foundation v. Lewis,* 722 F.2d at 1428. As the defendants noted, alignment #7 would double the travel distance from the highway to the communities of Baylis, New Salem, and Griggsville.

The plaintiffs maintain that alignment #7, or a route like it, would be a prudent alternative. They do not contest the facts underlying the defendants' determination, however. Considering the adverse impacts cumulatively, we think the Secretary could have reasonably concluded that alignment #7 was not a prudent alternative.

*Alignment #1C.* Alignment #1C is the northernmost feasible alternative. Various documents in the record indicate that, next to alignment #5, it is the route which the state defendants considered to be the best. Nevertheless, they rejected it as not prudent.

The plans for alignment #1C include two bridges to pass over the Norfolk & Western Railroad tracks, adding over $12 million to the highway's cost. Further, the highway would traverse the Valley City Quarry and sever it into two parts. *4(f) Statement,* Vol. 1 at 57; *id.,* App. A, Figs. 47, 55. Compensation to the quarry owner is estimated at about half a million dollars. In the western bluffs at the Illinois River, alignment #1C would require an opening 400 feet wide and 2700 feet long. This excavation would create 350,000 cubic yards of waste material that would need to

---

**6.** From Pittsfield to Barry, four variations were considered (#7, 7A, 7B, 7C). Of these, #7A was found to be the best alternative. Accordingly, the defendants studied a combined route consisting of #7 from route 100 to Pittsfield, and #7A from Pittsfield to Barry. For convenience, we refer to the combined route simply as "alignment #7."

be disposed of, perhaps in a portion of the quarry that would have to be purchased anyway. By comparison, alignment # 5 would produce 270,000 cubic yards of waste material from the bluffs.

The defendants fear that this alignment could result in major erosion problems due to the need for extensive excavation through soft, highly erodible loess soil. Though concrete retaining walls and other erosion control measures could be used to mitigate the danger, erosion problems would remain likely to occur during periods of heavy precipitation. Visually, the combination of the concrete retaining walls and the lengthy straight cut through the bluffs would result in an adverse impact known as the "concrete canyon" effect. *See id.* at App. B.

Alignment # 1C would have a severe agricultural impact, causing 54 miles of adverse farmer travel, severing 24 farms, and creating 379 acres of severance management zone. Alignment # 5, by comparison, would cause 12 miles of adverse farmer travel, sever 11 farms, and create 191 acres of severance management zone. For these reasons, alignment # 1C was strongly opposed by the Illinois Department of Agriculture. *Id.* at Exh. 9. In addition, alignment # 1C would cost $21 million more than alignment # 5 and would take two and one-half to three years longer to complete. Finally, alignment # 1C would have potential adverse effects on two archaeological sites that are eligible for the National Register of Historic Places, the Jeffrey site and the Indian Dance site. These severe impacts, taken together, support the Secretary's determination that alignment # 1C was not a prudent alternative.

*Alignment # 2.* Alignment # 2 was rejected for substantially similar reasons. Like alignment # 1C, it required a lengthy cut in the western bluffs, producing 1,150,-000 cubic yards of waste material, or over four times as much as alignment # 5. As with alignment # 1C, the cut would have adverse effects with respect to costs, delay, erosion control, and the appearance of the surrounding topography. The study team attempted to reduce the size of the cut by building the highway segment on a +3% gradeline from the east side of the river over to the western bluffs. This would have meant 6000 feet of continuous steep slope, posing possible safety hazards. Moreover, the west end of the bridge would then lie not in a rock formation but in loess soil, making it difficult to anchor the bridge. This idea was therefore abandoned.

In addition, alignment # 2 cuts through an important wildlife habitat. The 450 foot wide, 3,700 foot long concrete canyon would pose a significant barrier to wildlife movement. Unlike alignment # 5, where this barrier effect could be mitigated by the bridging of natural side ravines, no such ravines are present along alignment # 2. Moreover, with the highway in such a large cut it would be virtually impossible to build effective animal underpasses that would not cause additional slope stability problems. The probable result would be a large number of animals killed while attempting to travel between Flint Creek and Blue Creek.

Alignment # 2 was opposed by the Illinois Department of Agriculture due to several adverse agricultural impacts including 38 miles of adverse farmer travel, 16 farms severed, and 389 acres of severance management zone. It would also affect twelve prehistoric and nine historic sites. Finally, alignment # 2 would cost $17.1 million more than alignment # 5 and take two to three and one-half additional years to complete. Given these severe adverse impacts, the Secretary could have reasonably concluded that alignment # 2 was not a prudent alternative.

*Alignment # 3.* Like alignments # 1C and 2, alignment # 3 would be built on a 14 to 40 foot high embankment across the flood plain on the east side of the river. After crossing the river, alignment # 3 would pass through a large natural valley and therefore would need to be constructed on a high fill. Excavation of alignment # 3 would produce over 500,000 cubic yards of waste material from the west bluffs, nearly

twice as much as alignment # 5, but some of it could be used in the fill area.

Aesthetically, alignment # 3 is probably the least attractive alternative. As it lies in a straight line from the east side of the river to 9000 feet west of the bluffs, the highway could be seen for a considerable distance from various points on the bridge and east flood plain. *4(f) Statement*, Vol. 1 at 88. The large opening in the west bluffs (425 feet wide × 90 feet deep × 3600 feet in length) could be seen from at least three miles away, starting at route 100. *Id.* The cut would also involve erosion problems, increased costs, and added delay similar to the other alternatives.

In terms of agricultural impact, alignment # 3 is quite similar to alignment # 2, with 35 miles of adverse travel, 19 farms severed, and 362 acres of severance management zone. These figures compare unfavorably with alignment # 5. For these reasons, it was opposed by the Illinois Department of Agriculture.

As with alignment # 2, alignment # 3 crosses a wildlife area and, due to the absence of natural side ravines, impacts on wildlife movement cannot be substantially mitigated. Alignment # 3 also affects eleven prehistoric and seven historic sites. Finally, alignment # 3 would cost $9.3 million more than alignment # 5 to build. Based on these cumulative impacts, the Secretary could reasonably have concluded that alignment # 3 was not a prudent alternative.

*Alignment # 2 × 3.* Alignment # 3 crosses alignment # 2 at a point approximately one-quarter mile north of the Wade farm. In an attempt to reduce the adverse agricultural impacts associated with alignment # 3, the defendants developed alignment # 2 × 3, which follows the same route as alignment # 3 until its point of intersection with alignment # 2. From that point, alignment # 2 × 3 follows the same route as alignment # 2. Though some of the adverse impacts were reduced slightly, alignment # 2 × 3 causes substantially the same problems as alignments # 2 and 3. For this reason, the Secretary also

rejected alignment # 2 × 3. Given the validity of her determinations with respect to alignments # 2 and # 3, the Secretary was also entitled to reject alignment # 2 × 3.

■■■■ *Summary.* Though our discussion of the various alternatives necessarily omits many of the facts underlying the defendants' conclusions, we have reviewed the record in its entirety and find that it supports the Secretary's decision. The defendants properly understood the burden placed upon them by sections 4(f) and 138 and relied solely on legitimate adverse impacts for which full documentation was provided. In short, the determination that no feasible and prudent alternatives to alignment # 5 existed is not arbitrary and capricious. Accordingly, we have no authority to disturb the Secretary's decision. While it is tempting to suggest additional alternative routes, a full range of choices were selected through a reasoned methodology and considered in good faith. To reverse the Secretary's 4(f) determination in such circumstances would amount to nothing less than substituting our judgment for hers, and that we may not do.

### C. Minimization of Harms

When it is determined that there are no feasible and prudent alternatives to the use of 4(f) property for a highway project, sections 4(f) and 138 require that the project include all possible planning to minimize harm to the 4(f) property. In this section, we discuss the defendants' plans for minimizing harm to the Wade farm and the PCCA. We begin by considering two issues raised by the plaintiff concerning the propriety of the defendants' decision to use a portion of the Wade property.

1. *Treatment of the Wade Farm and the PCCA As a Single 4(f) Resource*

■■■■ The plaintiff maintains that the defendants improperly treated the Wade farm and the PCCA as a single 4(f) resource for purposes of measuring the harm resulting from the construction of the highway. In the 4(f) Statement, the defendants

described their analytical approach as follows:

> Because the Wade farm and the PCCA are adjacent to each other in an east-west direction, the underlying criterion for developing and assessing alternatives must be to minimize harm to both properties considered together as one resource. Accordingly, an alignment which decreases harm to one property could increase harm to the other to such an extent that harm to both properties, considered together, would not be minimized.

*4(f) Statement,* Vol. 1 at 150. Employing this framework, the defendants determined that, as between alignment #5 and five sub-alternate routes (#5A–5E) considered for purposes of mitigation, alignment #5 would be the most effective in mitigating the total harms to the Wade farm and the PCCA.

According to the plaintiff, this approach treats the Wade farm as a mere adjunct to the PCCA, depriving it of its independent 4(f) status. The plaintiff contends that alignment #5A should have been chosen because it would have totally avoided the Wade farm. Recognizing that alignment #5A would require the taking of some additional acreage from the PCCA, the plaintiff asserts that it would be better to leave the Wade farm untouched than to reduce the total harms to the two properties. In the plaintiff's view, the construction of a highway through the PCCA will so impair its recreational function as to render a few additional acres meaningless.

We disagree. First, the argument that the defendants' approach strips the Wade farm of its statutory protections is unsupported by facts or logic. In truth, the defendants' approach by its own terms recognizes the status of each 4(f) property and commands that they be treated equally. Second, as to the plaintiff's contention that it would be better to avoid the Wade farm entirely, we cannot say that the Secretary's contrary view is arbitrary and capricious. Indeed, there is substantial case authority holding that the defendants' approach is the *only* permissible one. As the Court of Appeals for the Eleventh Circuit recently stated:

> Relocation of the highway through another portion of the section 4(f) area or through other section 4(f) properties must be considered as a means of minimizing harm.... [The statutes require] a simple balancing process which totals the harm caused by each alternate route to section 4(f) areas and selects the option which does the least harm.

*Druid Hills Civic Assoc. v. Federal Highway Administration,* 772 F.2d 700, 716 (11th Cir.1985) (citations omitted); *see also Louisiana Environmental Society v. Coleman,* 537 F.2d at 85–86. The method prescribed in *Druid Hills* and *Louisiana Environmental Society* is identical in effect to the method employed in the present case.

Moreover, the plaintiff errs in assuming that the defendants' choice of alignment #5 over alignment #5A rests on no more than a comparison of total acreage taken. The record is quite clear that alignment #5A would cause safety and engineering problems comparable to alignments #1, 1A, and 1B, and erosion and other excavation-related difficulties comparable to alignments #2, 3, and 2 × 3. *4(f) Statement,* Vol. 1 at 153–55. Further, the defendants recognized that while alignment #5A did not directly touch upon the Wade property, it passed close enough on the north end to pose a threat to the wildlife sanctuary. In sum, the Secretary could have reasonably concluded that utilizing alignment #5A would cause significant additional damage to the environment of Napoleon Hollow and be inconsistent with the congressional goal of reducing harm to 4(f) properties.

### 2. *Judicial Estoppel*

The second issue is whether the defendants are "judicially estopped" from advocating a route that traverses any part of the Wade farm. The doctrine of judicial estoppel "precludes a party from advocating a position inconsistent with one previously taken with respect to the same facts in an earlier litigation." *Himel v. Conti-*

nental *Illinois National Bank and Trust Co.,* 596 F.2d 205, 210 (7th Cir.1979) (quoting *In Re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 279 (4th Cir.), *cert. denied,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974)). We are aware of no Seventh Circuit case other than *Himel* in which the doctrine of judicial estoppel was even discussed.

■ During the course of the previous litigation, the defendants abandoned their original proposal to build the highway through the Wade farm. Rather, in an attempt to settle the litigation, the defendants represented that they would cross no portion of the Wade property. Though no settlement was reached, the defendants continued to advance a proposal much like alignment # 5A that passed just north of the Wade property. The plaintiff contends that the defendants are now estopped from arguing in favor of a route that does not avoid the Wade farm.

As in *Himel,* the doctrine is not applicable here because we are not dealing with "the same facts" as in the previous suit. Though the two cases are obviously related, we have before us now a totally new 4(f) Statement. *See Wade v. Baise,* 767 F.2d 925 slip op. at 5–6 (dismissing appeal of prior case as moot because of approval of new 4(f) Statement). The new 4(f) Statement draws upon an expanded body of facts developed in accordance with our *Wade v. Lewis* decision.

More important, perhaps, is the fact that judicial estoppel is an equitable doctrine. The defendants understood that they were to undertake a *de novo* review of the alternatives to a Napoleon Hollow route. Rather than being bound by their previous position, they were bound to take a fresh look at any and all available alternatives. As such, they were entitled to consider those alternative routes that previously had been rejected.

### 3. *Measures to Minimize Harm*

■ After determining that alignment # 5 was superior to the five sub-alternates in terms of minimizing adverse impacts, the defendants considered particular design features that would further reduce the amount of harm to the 4(f) properties. Although the plaintiff has challenged none of the specific features of the defendants' extensive minimization plan, we summarize them here because they form an integral part of the FAP 408 project and have considerable public importance. The Secretary's decision approving the 4(f) Statement, and therefore our affirmance of the Secretary's decision, is based on the presumption that these measures will in fact all be implemented.

Alignment # 5, like the alternative routes, would be built on an embankment across the flood plain on the east side of the river. Before reaching the river, the alignment splits into two separate roadways, necessitating two bridges across the river. The two roadways reconnect at the eastern edge of the Wade farm. According to the defendants, the dual bridges will take advantage of the natural openings in the west bluffs and provide for minimum disruption of the topography. In addition, the highway will be built along the walls of the Napoleon Hollow valley, reducing visual impacts, facilitating wildlife movement, and allowing natural drainage patterns to remain substantially undisturbed. Retaining walls, discussed earlier with respect to the alternative routes, will be used to reduce erosion and minimize the acreage required for highway construction.

The defendants will build additional bridges, at a cost of approximately $6 million, across six major side ravines in the valley. This will permit wildlife access from one side of the highway to the other and also will have salutary effects upon aesthetics and drainage patterns, particularly when compared with the alternative of filling the ravines with earth.

Across the Wade farm, the highway median will be narrowed from a normal width of 54 feet to 18 feet to reduce the amount of acreage taken from 22.5 to 12.5 acres. The overpass at township road 490, which defines the western edge of a portion of the Wade property, will be located off the

Wade property to avoid disturbing the wild-life sanctuary. North of the Wade barn, the highway will be built eight feet below the present ground level to minimize noise and visual impacts. Further, if requested by the owner of the property, the defendants will plant several rows of 10–15 year old pine trees around the north and west sides of the Wade barn and house as a "vegetative screen."

Alignment # 5 will take 31 acres from the PCCA, 21 of which can be revegetated after construction. The construction of the dual roadways will divide the PCCA into three segments: a 111-acre portion north of the westbound lanes; a 35–acre portion in the middle; and a 557–acre portion to the south. To mitigate the effects of this construction upon wildlife and recreation, IDOT has agreed to acquire three parcels of property and transfer them to the Illinois Department of Conservation ("IDOC"). *4(f) Statement*, Vol. 1, Exh. 12 (Agreement Between IDOT and IDOC); *Id.*, Exh. 13 (U.S. Fish and Wildlife Service Biological Opinion). The first parcel consists of 240 acres located immediately south of the PCCA. This is the parcel that Dr. Dunstan suggested the state purchase to replace lost eagle habitat in the PCCA. The annexation of this land will also increase the buffer area between the documented night roost in the southern portion of the PCCA and disruptions from human activity in the Florence area. With the acquisition of this parcel, the southern portion of the PCCA will comprise a larger parkland than the entire PCCA in its present form.

North of the PCCA, the state has agreed to acquire a 68-acre parcel and a 78-acre parcel. These acquisitions will increase the acreage in the northern portion of the PCCA from 111 acres to a more easily manageable total of 257 acres. Moreover, they will place the Naples-Russell Mound # 8 and several other archaeological sites within public protection. In total, IDOT will acquire 386 acres for annexation to the PCCA.

Additionally, IDOT will assist IDOC in obtaining funds to acquire easements on (1) a 43-acre parcel on the west side of the river adjacent to the parcels to be acquired by IDOT, and (2) two parcels, approximately 5 acres total, lying between the east bank of the river and the levee which runs parallel to the river. The purpose of these easements would be to protect bald eagle and Indiana bat foraging areas and to preserve the scenic view of and from these areas.

IDOT has also committed itself to seasonal restrictions on highway construction activities. Pursuant to Dr. Dunstan's suggestion, IDOT agreed to refrain from any construction activities in the river, on the west side of the river in the PCCA, and west of the east river levee from November 15 through March 1 in any year in which construction is taking place. The purpose of this measure is to allow maximum use of the area by the eagles during the winter season. *See Wade v. Lewis*, 561 F.Supp. at 921. To protect the Indiana bat, the defendants will engage in no tree clearing in the project area during the bat maternity season, from April 1 to September 15.

IDOT has also agreed to construct a service building on PCCA grounds for use by IDOC officials. This facility will enable IDOC to oversee the security of sensitive areas during periods when eagles are present in the PCCA. Finally, IDOT has agreed to support ongoing eagle studies in the FAP 408 project area during and after the construction period. From these studies, additional information will be obtained to assist IDOC in the preservation of eagle habitat in the Illinois River basin.

The minimization plan goes well beyond the defendants' original plans and, indeed, beyond anything we have seen in prior reported cases. Through it, the defendants have committed themselves to perform an ongoing supervisory role in protecting the environment of Napoleon Hollow and the survival of the bald eagle and the Indiana bat. (Surprisingly, and perhaps significantly, the briefs of the Eagle Foundation, which total over one-hundred pages, do not

contain a single challenge to the defendants' conclusions respecting impacts upon endangered species). The President's Advisory Council on Historic Preservation commended the defendants for "the sensitive manner in which this project has been redesigned to minimize impacts to the Wade Farm Complex," *4(f) Statement,* Vol. 1, Exh. 14, and the United States Department of the Interior concluded in its "biological opinion" pursuant to the Endangered Species Act that the mitigation plan would "promote the conservation of the bald eagle and Indiana bat." *Id.,* Exh. 13. In anticipation of the defendants' fully meeting their solemn commitment to implement the minimization plan, the Secretary was entitled to conclude that the FAP 408 project included all possible planning to minimize harm.

### Conclusion

In contrast to the record before us in *Wade v. Lewis,* the present record provides a sufficient basis for the Secretary to have concluded that no feasible and prudent alternatives to a Napoleon Hollow alignment exist and that all possible planning to minimize harm has been undertaken. Having reviewed the entire record closely and critically, we perceive no basis for overturning the Secretary's determination. Accordingly, we deny the plaintiff's motion for summary judgment and grant the defendants' motion for summary judgment.

An appropriate order will enter.

NEW 4(F) STUDY LIMITS SHOWING
ALTERNATE RIVER CROSSINGS AND
ALIGNMENTS

SCALE 1" = 1 MILE

F.A.P. ROUTE 408

FIGURE 2