THE DEPARTMENT OF TRANSPORTATION *ex rel.* THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CALLENDER CONSTRUCTION COMPANY, Defendant-Appellant.

Fourth District    No. 4—98—0184

Argued October 13, 1998.—Opinion filed May 28, 1999.

William E. Lowry, of Pittsfield, and Forrest G. Keaton (argued), of Rammelkamp, Bradney, Kuster, Keaton, Fritsche & Lindsay, of Jacksonville, for appellant.

James E. Ryan, Attorney General, of Springfield (Michael J. Luke and Gary E. Barnhart (argued), Assistant Attorneys General, of counsel), for appellee.

JUSTICE KNECHT delivered the opinion of the court:

In January 1991, plaintiff, the Department of Transportation of the State of Illinois (Department or IDOT), by virtue of its power of eminent domain, filed a complaint for condemnation seeking to condemn property of defendant landowner, Callender Construction Company. In May 1991, defendant filed a motion to dismiss and traverse, alleging lack of necessity and statutory authority for the taking. In November 1993, the circuit judge denied the motion, holding the Department established a *prima facie* case of necessity but defendant failed to carry its burden of proof to rebut it. In February 1998, the trial court entered judgment per the stipulation of the parties, which stipulated the amount of compensation to be paid but preserved defendant's right to appeal the ruling on the condemnation. Defendant now appeals. We affirm.

This dispute arises from the condemnation of defendant's property by the Department in connection with the construction of Interstate 72 from Springfield, Illinois, to Quincy, Illinois, also known as the Central Illinois Expressway (Expressway). The defendant's land was to be subject to a restrictive easement. The State of Illinois (State), through legislation passed by the General Assembly, concluded that a highway connecting Springfield and Quincy was necessary for the public good. See *Wade v. Kramer*, 121 Ill. App. 3d 377, 381, 459 N.E.2d 1025, 1028 (1984) (hereinafter *Kramer*).

To carry out the mandate of the General Assembly, the State found it necessary to procure federal funding, as the State alone did not have the resources to finance the construction of the Expressway. Thus, the Department was required to comply with the mandates of the Department of Transportation Act (see 49 U.S.C. § 303 (1982) (formerly 49 U.S.C. § 1653(f) (1976))) to receive federal funds, without which the Expressway could not be constructed.

Specifically, the Department sought to acquire 35 acres of land in the Pike County Conservation Area (Conservation Area), which triggered the application of "section 4(f)," as it is commonly known, of

the Department of Transportation Act (49 U.S.C. § 303(c) (1982)). The Department determined it was necessary to construct the bridge through the Conservation Area. The Conservation Area land in question was sought for the construction of a bridge across the Illinois River, as it is necessary to cross the Illinois River at some point to construct the Expressway. See *Kramer*, 121 Ill. App. 3d at 378, 459 N.E.2d at 1028. However, section 4(f)(1) prohibits building federally funded highways through park land such as the Conservation Area unless no feasible or prudent alternative to construction in such areas exists. 49 U.S.C. § 303(c)(1) (1982).

Thus, the essential facts of this case begin with a former federal lawsuit involving the Department's compliance with section 4(f)(1). 49 U.S.C. § 303(c)(1) (1982). In *Wade v. Lewis*, 561 F. Supp. 913, 954 (N.D. Ill. 1983) (hereinafter *Lewis*), a permanent injunction was entered in federal district court preventing the construction of the Expressway. Although the court agreed no feasible or prudent alternative existed to the construction path through the Conservation Area, the Department had failed to show all possible planning had been done to mitigate damage to the Conservation Area as required by section 4(f). 49 U.S.C. § 303(c) (1982).

In an attempt to cure these deficiencies and obtain necessary federal funding, the Department engaged experts and commissioned a series of studies that were compiled and presented to natural resource agencies of Illinois to obtain expert advice on the nature and extent of mitigation required to preserve the wildlife habitat of the Conservation Area. At the federal level these reports were reviewed by the United States Fish and Wildlife Service. Upon review of the State's new proposal for mitigation in *Wade v. Dole*, 631 F. Supp. 1100, 1121 (N.D. Ill. 1986) (hereinafter *Dole*), the injunction was subsequently removed. In removing the injunction, the federal district court found the mitigation commitments made by the Department in the new section 4(f) plan brought it into compliance with all necessary federal mandates.

At the state level, the Department negotiated an agreement with the Illinois Department of Conservation (Conservation or IDOC), the state agency in control of the Conservation Area, to acquire Conservation Area land for construction of the Expressway. Conservation used the expertise of the Illinois Endangered Species Board (Board) to determine whether to approve the construction of the Expressway through the Conservation Area. Accordingly, the Department negotiated with and submitted several studies to the Board, which in turn submitted a recommendation to Conservation, advising it whether to approve the Expressway project through the Conservation Area.

The Board reviewed a series of studies submitted by the Department concerning the habitat and endangered species present in the construction area to determine what action was necessary to protect the habitat there. Upon the Department's commitment to acquire various interests in private lands using its power of eminent domain to replace the land acquired from the Conservation Area, the Board recommended to Conservation it approve the Expressway project. Based on the Board's recommendation, the Department in May 1984 entered into an intergovernmental agreement with Conservation that called for the acquisition of various interests in surrounding lands and certain protective easements.

Specifically, the agreement provided for the transfer of certain Conservation Area land to the Department and for the replacement of that land acquired from the Conservation Area. Pursuant to this agreement, the Department would acquire fee title to 35 acres of land in the Conservation Area upon which the Expressway would be constructed. In exchange for this land, Conservation would receive fee title to approximately 400 acres of land, plus control of interests in other tracts covering several hundred additional acres. Among the various other interests to be acquired by the Department, a restrictive easement would be taken on defendant's property.

On January 28, 1991, the Department filed its complaint for condemnation against defendant seeking to take an easement on defendant's property. Defendant filed a motion to dismiss and traverse in May 1991, alleging lack of necessity and statutory authority.

At a June 1991 evidentiary hearing, the Department produced three witnesses in support of its complaint. These witnesses testified on the necessity of the Department's actions, including acquiring the Conservation Area land, the ensuing state and federal litigation, and negotiating an agreement with Conservation.

After the evidentiary hearing, the trial court ordered briefs and set the cause for oral argument. In November 1993, the trial court entered an opinion finding the Department had no authority to acquire a ''scenic easement'' on defendant's property (605 ILCS 5/4—201.5 (West 1992)), but finding the Department had authority to take an interest in defendant's land (605 ILCS 5/4—501 (West 1992)) based on the intergovernmental agreement between the Department and Conservation that deemed the taking necessary by both agencies and, therefore, necessary by the legislature.

Defendant filed a motion to reconsider and vacate and a supplemental motion to reconsider and vacate, which the trial court denied. Defendant now appeals.

■ This appeal is taken pursuant to Supreme Court Rule 303 from

the final judgment of a circuit court. 155 Ill. 2d R. 303. The determination of whether a right of condemnation exists in a particular case is a question of law, and the scope of review is independent of, not deferential to, the decision of the trial court. *County of De Kalb v. Smith*, 213 Ill. App. 3d 775, 778, 572 N.E.2d 379, 380 (1991).

■ On appeal, defendant challenges the Department's authority to acquire a restrictive easement on its land to replace the public land acquired from the Conservation Area. The issue presented for review is whether the trial court erred in holding the Department had authority to take a restrictive easement on defendant's property. Defendant alleges three basic points: (1) defendant's property was not necessary to or convenient for the purpose of constructing the public road; (2) the taking of the restrictive easement on defendant's property was without statutory authority; and (3) the amount of property taken was grossly excessive, constituting an abuse of power. When a motion to dismiss and traverse the condemnation complaint is filed challenging the authority to condemn, the burden is on the condemnor to make a *prima facie* case of necessity. *Department of Public Works & Buildings v. Keller*, 61 Ill. 2d 320, 324, 335 N.E.2d 443, 447 (1975). After the plaintiff establishes its *prima facie* case, the burden shifts to defendant to go forward with evidence to rebut the *prima facie* case. *City of Oakbrook Terrace v. La Salle National Bank*, 186 Ill. App. 3d 343, 348, 542 N.E.2d 478, 481 (1989).

■ The Department has only such powers of eminent domain as are conferred upon it by the legislature. *Department of Public Works & Buildings v. Ells*, 23 Ill. 2d 619, 621-22, 179 N.E.2d 679, 680 (1962). The law conferring the authority must be strictly construed. *City of Mount Carmel v. Partee*, 74 Ill. 2d 371, 378, 385 N.E.2d 687, 690 (1979). Our function on review is to determine if the power of eminent domain was exercised within the limits of the law. *City of Mount Carmel*, 74 Ill. 2d at 378, 385 N.E.2d at 690.

On appeal, defendant first contends the taking of a restrictive easement on defendant's property was not necessary or convenient for the purpose of constructing the Expressway. In this case, the need to acquire land already owned by the State and devoted to a public purpose triggered the interplay of the statutory requirements of Illinois Highway Code (Code) sections 4—501, 4—504, and 4—509, governing the power of eminent domain (Ill. Rev. Stat. 1991, ch. 121, pars. 4—501, 4—504, 4—509 (now 605 ILCS 5/4—501, 4—504, 4—509 (West 1992))). Thus, in addition to satisfying federal statutory requirements for funding, the Department was also required to act pursuant to the state statutory scheme to acquire the necessary Conservation Area land and that necessary for its replacement.

■ Section 4—501 of the Code grants the Department the general power of eminent domain to acquire land necessary for highway construction. Section 4—504 requires the Department to negotiate an agreement with the state agency having control and custody of public lands sought for highway purposes. Further, the Department is not empowered with authority to condemn such lands but is required to gain the consent of the relevant state agency to acquire the public land in question. Ill. Rev. Stat. 1991, ch. 121, par. 4—504 (now 605 ILCS 5/4—504 (West 1992)). Finally, section 4—509 vests the Department with the authority to acquire land to replace public lands acquired through agreement with other State agencies. Section 4—509 further authorizes the Department to use its power of eminent domain to replace such public lands.

■ The Department has the authority to acquire property according to section 4—501 of the Code (Ill. Rev. Stat. 1991, ch. 121, par. 4—501 (now 605 ILCS 5/4—501 (West 1992))), which provides in part:

"The Department *** may acquire the fee simple title, or such lesser interest as may be desired, to any land, rights, or other property *necessary for the construction*, maintenance or operation of State highways, *** or *necessary for any other purpose* or use contemplated by this Code by purchase or *by the exercise of the right of eminent domain* under the eminent domain laws of this State ***." (Emphasis added.)

Pursuant to section 4—501, the taking of the lesser interest, in this case the restrictive easement, must be "necessary." The Supreme Court of Illinois defines the term "necessary," as used in statutes such as the Eminent Domain Act, as meaning "expedient," "reasonably convenient," or "useful to the public," and not as limited to an absolute physical necessity. *Department of Public Works & Buildings v. Lewis*, 411 Ill. 242, 245, 103 N.E.2d 595, 597 (1952). Thus, the term "necessary" as used throughout the Code provisions governing eminent domain retains this same meaning. Ill. Rev. Stat. 1991, ch. 121, pars. 4—501, 4—504, 4—509 (now 605 ILCS 5/4—501, 4—504, 4—509 (West 1992)).

A *prima facie* case of necessity, for the purposes of a motion to dismiss and traverse the condemnation complaint, is established by introducing a resolution, plan, declaration or the like by the authorized public agency that recites public "necessity." *State of Illinois Medical Center Comm'n v. United Church of the Medical Center*, 142 Ill. App. 3d 498, 502, 491 N.E.2d 1327, 1330 (1986); see also *Alsip Park District v. D&M Partnership*, 252 Ill. App. 3d 277, 285, 625 N.E.2d 40, 45-46 (1993) (meeting *prima facie* burden by introducing park district plan that recited future recreational needs); *Village of*

*Deerfield v. Rapka*, 54 Ill. 2d 217, 225, 296 N.E.2d 336, 340 (1973) (establishing *prima facie* case with ordinance reciting need for recreational center); *City of Chicago v. Walker*, 50 Ill. 2d 69, 71, 277 N.E.2d 129, 130 (1971) (introducing resolution and ordinance in support of taking in satisfaction of *prima facie* burden).

The Supreme Court of Illinois in *Keller*, 61 Ill. 2d at 325, 335 N.E.2d at 447, held "[t]he agency on which the power [of eminent domain] has been conferred *** has the authority to decide the necessity for its exercise." Here, the Department entered into an intergovernmental agreement with Conservation based on extensive environmental studies. The agreement recites the necessity of acquiring the restrictive easement on defendant's land. Further, the agreement itself acknowledges it was reached with the aid of several experts to determine and evaluate the private lands necessary to replace the Conservation Area's wildlife habitat.

■ We agree with the findings of the trial court and conclude the Department satisfied its *prima facie* burden of proof of necessity under section 4—501 of the Code based on the agreement between the Department and Conservation that recites the necessity of acquiring the restrictive easement on defendant's land.

Defendant's alternate contention on appeal is the Department is without authority to acquire this restrictive easement under its general eminent domain authority of section 4—501 of the Code because the easement is not being taken for the physical construction of the Expressway.

To fully understand the limits of the Department's authority, examination of the litigation history of the Expressway project and evaluation of the interplay of the federal and State statutory mandates are necessary. First, the construction of the Expressway was deemed necessary for the public good by the General Assembly. Further, in *Kramer*, 121 Ill. App. 3d at 378, 459 N.E.2d at 1026, this court acknowledged the bridge through the Conservation Area was a necessary link for construction of the Expressway. Likewise, the federal district court in *Dole*, 631 F. Supp. at 1121, noted the only feasible crossing for the Expressway across the Illinois River was through the Conservation Area. Thus, the legislature mandated the construction of the Expressway as necessary, while later litigation revealed the necessity of building the Expressway through the Conservation Area.

At the federal level, in *Lewis*, 561 F. Supp. at 954, the Department was enjoined from constructing the Expressway through the Conservation Area. After the injunction in *Lewis*, the Department undertook a number of studies and in-depth reviews of the effects of construction on the animal wildlife and habitat. Further, the Department worked

with a number of government agencies, including the Board, Conservation, the United States Fish and Wildlife Service, and the Federal Highway Administration in evaluating the impact of construction on the Conservation Area. Based on the additional studies, the Department developed a new mitigation action plan, which became the basis for the approval of the construction plan for the Expressway through the Conservation Area. See *Dole*, 631 F. Supp. 1100.

At the state level, the Department was required to comply with the Code. Ill. Rev. Stat. 1991, ch. 121, pars. 4—501, 4—504, 4—509 (now 605 ILCS 5/4—501, 4—504, 4—509 (West 1992)). Based on the statutory scheme governing the Department's exercise of eminent domain, the Department had no authority to condemn property owned by Conservation. Instead, the Department was required to negotiate an agreement with Conservation to acquire the right-of-way through the Conservation Area. Ill. Rev. Stat. 1991, ch. 121, pars. 4—501, 4—504, 4—509 (now 605 ILCS 5/4—501, 4—504, 4—509 (West 1992)). Pursuant to section 4—504 of the Code, property owned by the State and devoted to a public use cannot be condemned by the Department without consent of the state agency with control and custody of that land. Section 4—509 of the Code empowers the Department to exercise its power of eminent domain to replace public lands acquired for highway purposes. Section 4—509 authorizes the Department to "acquire through the exercise of the right of eminent domain, such easements, rights, lands or other property as may be necessary to replace the public property being acquired." Ill. Rev. Stat. 1991, ch. 121, par. 4—509 (now 605 ILCS 5/4—509 (West 1992)). Thus, based on the state statutory scheme, the Department was required to negotiate a replacement agreement with Conservation and comply with all statutory mandates regarding wildlife habitat and endangered species.

In reaching this agreement, Conservation acted based on the recommendation of the Board. The expertise of the Board was significant in that a number of endangered species lived in the Conservation Area and had to be protected to receive federal funding. Upon receiving the necessary commitments from the Department, the Board recommended Conservation approve construction of the Expressway through the Conservation Area.

Thereafter, the Department and Conservation entered into an intergovernmental agreement. Such agreements are encouraged by the Intergovernmental Cooperation Act (see 5 ILCS 220/1 *et seq.* (West 1996)), which provides any one or more public agencies may contract with any one or more other public agencies to perform any governmental service, activity or undertaking, which any of the public agencies is authorized by law to perform, provided the contract is authorized by

the governing body of each party to the contract. 5 ILCS 220/5 (West 1996).

The purpose of the intergovernmental agreement between the Department and Conservation was twofold. At the state level, the agreement provided for compensation to Conservation for the land taken from the Conservation Area and outlined the commitments of the Department in replacing land to secure habitat and endangered species protection. At the federal level, the agreement served to satisfy federal mitigation requirements, a necessary step to federal funding. Thus, the Department, proceeding pursuant to the mandates of the Code and against the backdrop of intergovernmental cooperation, acted within its authority to acquire a restrictive easement on defendant's property.

As the Department was authorized to condemn the property in question pursuant to the Code and it made a *prima facie* case of necessity, defendant must produce evidence of an abuse of discretion by the governing body. *Trustees of Schools of Township 37 North, Range 11, Cook County, Illinois v. Sherman Heights Corp.*, 20 Ill. 2d 357, 359, 169 N.E.2d 800, 802 (1960). The general rule where the right of eminent domain is granted is that necessity for its exercise is not a judicial question, and its exercise is not the proper subject for judicial interference *unless* to prevent clear abuse of such power. *Lewis*, 411 Ill. at 246, 103 N.E.2d at 597. The Supreme Court of Illinois, in *Smith v. Claussen Park Drainage & Levee District*, 229 Ill. 155, 163-64, 82 N.E. 278, 281 (1907), stated in a condemnation action "the court will not inquire into the extent to which the property is necessary for such [public] use unless it appears that the quantity of property taken is grossly in excess of the amount necessary for the use."

Defendant's final contention on appeal is the Department exceeded its authority under section 4—509 of the Code as its authority is limited to "replacement" of public lands acquired for highway purposes, making it grossly excessive to impose the restrictive easement on defendant's property. In this case, the Department possessed no independent expertise to determine the impact of the Expressway on the habitat in question. Therefore, it commissioned studies and engaged several outside experts to satisfy federal mandates. At the state level, the Department was required to negotiate an agreement with Conservation. Ill. Rev. Stat. 1991, ch. 121, pars. 4—504, 4—509 (now 605 ILCS 5/4—504, 4—509 (West 1992)). In reaching the agreement, the Department and Conservation, with the aid of several experts, analyzed and evaluated the replacement land necessary for mitigation of the impacts caused by the construction of the Expressway.

The Department was required to take into account the findings of

the Board, which recommended the acquisition of restrictive easements such as the one on defendant's property to Conservation. The record in this case demonstrates that without the commitment by the Department to acquire restrictive easements, Conservation would not support the Expressway project. As a result, the Expressway would not have been built, because the Department would not have satisfied the necessary requirements under section 4(f) of the Department of Transportation Act (see 49 U.S.C. § 303(c) (1994)). Since the Department was required to comply with these various mandates, it cannot be said it committed a manifest abuse of discretion.

However, defendant argues that although the Department may enter into intergovernmental agreements, the agreements are limited in scope to that authorized by law. Defendant claims the Department was only authorized to "replace" the land acquired from the Conservation Area. In support of its claim of abuse of discretion, defendant cites *County of St. Clair v. Faust*, 278 Ill. App. 3d 152, 662 N.E.2d 584 (1996), where the fifth district found an abuse of the eminent domain power by the condemning authority. The Army Corps of Engineers was required to mitigate the loss of 80 acres of wetlands acquired in connection with airport construction. St. Clair County sought to condemn 200 acres of farmland, while at the same time the Corps of Engineers required only 81.4 acres as necessary to replace the acquired wetlands. Defendant's reliance on *County of St. Clair* is misplaced, as *all* testimony offered by the Department herein reflects the need to acquire *all* of the various land interests as specifically outlined in the agreement between the Department and Conservation. In other words, no evidence contradicting the necessity of acquiring said private land interests was presented by either the Department or the defendant.

Defendant asserts an excessive disproportion between the quantity of land acquired in the Conservation Area and that condemned to replace it. Evidence presented in this case establishes the Conservation Area provides "habitat" for various wildlife found in the State, some of which were on the endangered species list as provided by the Board. While the replacement of 35 acres with 400 acres in fee and several hundred additional acres of restrictive easements is mathematically disproportionate, it is not grossly excessive when all the evidence presented demonstrates that amount of land is necessary to secure habitat and endangered species protection.

The Supreme Court of Illinois has held the power of eminent domain "is broad and plenary and it is only in the exceptional case where such authority and power have been manifestly abused that the courts will interfere." *Department of Public Works & Buildings*, 61 Ill. 2d at 325, 335 N.E.2d at 447. Defendant attempts to quantify the

word "replace" narrowly, *i.e.*, an acre taken must be replaced with an acre, regardless of the quality or value of the acre being replaced. In accepting defendant's interpretation of the word "replace," this court would be required to disregard entirely or inquire into and second-guess the agency on the quantity and quality of replacement lands. Given the Department's extensive study and collaboration with other state and federal agencies, and the absence of any contrary evidence presented by defendant, it is not the province of this court to quantify or qualify the land interests deemed necessary to replace the habitat in question.

We hold plaintiff established a *prima facie* case of necessity by demonstrating (1) the necessity of the taking, (2) its authority for such taking under sections 4—501, 4—504, and 4—509 of the Code, and (3) the proper exercise of discretion within the limits of its authority. Defendant failed to carry its burden to rebut plaintiff's *prima facie* case.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE COOK, dissenting:

In connection with the construction of Interstate 72 and the construction of a bridge across the Illinois River, IDOT desired to acquire 35 acres of land controlled by IDOC. Various actions were filed by objectors seeking to block the construction of the highway through this area. In 1985, IDOT entered into an agreement with IDOC for the 35 acres, in exchange for IDOT acquiring the following land for IDOC: (1) fee title to 400 acres specified by IDOC and (2) control of interests in another several hundred acres as specified by IDOC, including defendant's land. This agreement was not mandated by any federal authority. No federal case was pending at the time of the agreement. IDOC had desired these lands for many years but had been unable to obtain funding from the General Assembly.

Section 4—509 of the Code deals with the acquisition of property to replace the property of a public agency. 605 ILCS 5/4—509 (West 1992). Unfortunately for IDOT, that statute limits the right to take property to such "property as may be necessary to *replace* the public property being acquired." (Emphasis added.) 605 ILCS 5/4—509 (West 1992). Apparently recognizing the difficulty of an argument that acquisition of 400 acres and more was necessary to "replace" 35 acres, IDOT did not attempt to rely upon section 4—509 in the circuit court. Defendant tells us that IDOT never mentioned section 4—509 until

the case reached this court. No evidence was presented to the circuit court that the acquisition of the 400 acres was necessary to replace the 35 acres, and the circuit court never made such a finding.

Instead, IDOT filed a complaint seeking the acquisition of the properties under the "scenic easement" provisions of section 4—201.15. 605 ILCS 5/4—201.15 (West 1992). IDOT later amended its complaint to further allege that the acquisition was necessary under section 4—501 (605 ILCS 5/4—501 (West 1992)), which provides for the acquisition by eminent domain of property "necessary for the construction, maintenance or operation of State highways." IDOT argued that it was "necessary" that it acquire the 400 acres because that was what it had agreed to with IDOC. The circuit court accepted IDOT's argument:

> "That the court herein finds that the agreement by and between the [Department] and [Conservation] was an agreement deemed necessary by both agencies and therefore deemed necessary by the legislature, and therefore the lands which are the subject of those agreements are hereby determined 'necessary' land taken for 'public use.' "

The circuit court denied the count seeking acquisition as a scenic easement. The acquisition was not shown to be necessary "for the preservation of the natural beauty of areas through which State highways are constructed" (605 ILCS 5/4—201.15(a) (West 1992)), and was necessary only because of the agreement with IDOC.

The general rule is that where the right of eminent domain is granted, the necessity for its exercise, within constitutional restrictions, is not a judicial question, and its exercise is not a proper subject for judicial interference or control unless to prevent a clear abuse of such power. *Department of Public Works & Buildings v. Farina*, 29 Ill. 2d 474, 477, 194 N.E.2d 209, 211 (1963). Is it really necessary to have a highway between Springfield and Quincy? Is it really necessary for the highway to go through Pike County? Is it really necessary that the highway be a four-lane highway? All these questions are clearly for the legislature and for IDOT, and not for the courts. It is apparent, however, that the question before us is not of that nature. IDOT says that it is necessary to acquire the 400 plus acres because that is what IDOC required. As IDOT's deputy chief counsel testified, "we were directed by [Conservation] to do it."

As defendant argues, what if IDOC had decided that it wanted 5,000 acres of land, or if it wanted defendant's home and farm 20 miles from the road? What if IDOC had demanded that IDOT build a new IDOC residence and service/office building? (IDOC did so here.) We should reject the idea that IDOC has unbridled discretion. We

should reject IDOT's attempt to avoid the limitations of section 4—509. IDOT has only such powers of eminent domain as are conferred upon it by the legislature. The law conferring the authority must be strictly construed. *City of Mount Carmel v. Partee*, 74 Ill. 2d 371, 378, 385 N.E.2d 687, 690 (1979). IDOT recognizes that there are limits upon its power to acquire land by eminent domain. The argument that there are no limits upon IDOC's power to demand replacement property, perhaps in reaction to pressure by environmental groups, is without support. IDOC does not have the right to force IDOT to choose between acceding to its unreasonable demands or abandoning the highway.

The majority opinion notes that the agreement was "reached with the aid of several experts to determine and evaluate the private lands necessary to replace" the 35 acres, that studies were commissioned and outside experts were employed, and that significant expertise was brought to bear on this problem. 305 Ill. App. 3d at 403. I have no doubt that the 400 acres acquired in fee and the several hundred acres in which a lesser interest were acquired are useful to IDOC and will have a beneficial impact on animal wildlife and habitat. I do question whether IDOC and its experts had any motivation to limit the lands taken to those necessary to replace the 35 acres. The trial court made no finding that such replacement was necessary, and it appears IDOT did not address that issue in the trial court.

The majority states that intergovernmental agreements are encouraged. I believe that is true but I would caution that an agreement between two governmental bodies should not be allowed to compromise basic rights of individuals. The government is not entirely free to take a person's property whenever it is willing to compensate him. We should reverse the decision of the trial court. The fact that IDOT and IDOC have entered into an agreement that IDOT acquire 400 acres for IDOC does not require a finding that such acquisition is necessary under section 4—501.

That is not to say that IDOC must return all the lands and rights that IDOT has acquired for it and that IDOT must return Interstate 72 to IDOC. See *M.A. Felman Co. v. WJOL, Inc.*, 104 Ill. App. 2d 66, 72-73, 243 N.E.2d 33, 36-37 (1968) (impossibility of performance because of governmental laws or regulations); see also 810 ILCS 5/2—615 (West 1992) (nondelivery of goods by compliance in good faith with any applicable foreign or domestic governmental regulation or order). I would read the agreement between IDOT and IDOC to include the implied condition that the agreed-to acquisitions be approved by the court. I would hold that IDOC did not have the right to insist on the conditions that it did in this agreement. Nevertheless,

IDOC may be able to argue that it was not a party to these proceedings and may have the right to litigate any dispute with IDOT elsewhere.